**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

LLOYD T. LEWIS,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        1:19cv528
                                         )
EDWARD DEAN LANCE, MD,                   )
                                         )
            Defendant.                   )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States
Magistrate Judge for a recommendation on a motion for summary
judgment (Docket Entry 95 (the "Summary Judgment Motion")) by
Edward Dean Lance, M.D. ("Lance"). For the reasons that follow,
the Court should grant the Summary Judgment Motion.

**BACKGROUND**

**I.  Procedural History**

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Lloyd T. Lewis
(the "Plaintiff"), a convicted state prisoner acting pro se,
commenced this action against Stephanie Brathwaite ("Brathwaite")
and Lance for acts and/or omissions amounting to deliberate
indifference to Plaintiff's serious medical needs during his
incarceration at Albemarle Correctional Institution ("ACI"). (See
Docket Entry 2 (the "Complaint") at 1-30.)[1] In particular, the

_____

    1  Citations herein to Docket Entry pages utilize the CM/ECF
footer's pagination.

Complaint alleges that Brathwaite and Lance (collectively, "Defendants") have denied Plaintiff "ad[e]quate medical equipment and care" and have refused to "allow[ him] to see a[n] outside doctor" (id. at 7; see also id. (referencing Brathwaite's denial of Plaintiff's requests for "wheelchair, bed board, [] bottom bunk on [] bottom floor, [and ]extra mattress")). Moreover, Plaintiff has asserted that Lance failed to address problems with Plaintiff's feet and spine (to include three minor spinal fractures), which have caused Plaintiff pain for more than two years. (See id. at 9-10.) "Lance [also] took [Plaintiff] off . . . Indomethacin[], . . . the only pain med[ication] that has given [Plaintiff] any pain relie[f] in over [two] years." (Id. at 10.) Such conduct by Defendants allegedly violated Plaintiff's eighth-amendment rights, for which violation he has sought, from Defendants in their official capacities, $3 million in damages. (See id. at 14.)[2]

---

[2] Plaintiff attached to the Complaint (i) an informational sheet regarding a thyroid medication (see id. at 8), which Plaintiff has failed to take despite possessing a prescription for the same (see id. at 7), (ii) a memorandum from a (non-party) nurse explaining why Plaintiff did not qualify for "a bottom bunk, extra mattress, bed board, lower level, or extra pillows" (see id. at 13 (noting Plaintiff's diagnosis of chronic pain and listing guidelines for requested equipment and restrictions)), (iii) forms documenting Plaintiff's receipt of a wheelchair (id. at 25) and Plaintiff's request for copies of previously submitted grievances (id. at 26), and (iv) copies of numerous grievance forms submitted by Plaintiff, administrative responses to those grievances, and related correspondence from prison officials (see id. at 31-102).

2

Lance simultaneously answered the Complaint (Docket Entry 22) and moved to dismiss the Complaint for failure to state a claim, invoking both qualified immunity and eleventh-amendment immunity (see Docket Entry 20 at 1). In similar fashion, Brathwaite answered the Complaint (Docket Entry 23) and moved for judgment on the pleadings on the same grounds as Lance (see Docket Entry 24 at 1). In response, Plaintiff moved to amend the Complaint, explaining that he wished to sue Defendants in their individual capacities (as well as their official capacities, as originally asserted). (See Docket Entry 33 at 1–2.) The Court (per the undersigned) deemed the Complaint amended in the manner that Plaintiff had proposed (Text Order dated Oct. 22, 2019), construed the answers by Defendants "as denying such individual[-]capacity liability without need for further action" (id.), and set a deadline for Defendants to move to dismiss the individual-capacity claims (id.). Defendants timely tendered a motion to dismiss and motion for judgment on the pleadings, respectively. (See Docket Entries 34, 37.)[3]

The undersigned recommended that the Court grant partial relief to Defendants, concluding that (i) the official-capacity claims failed as a matter of law (because the Complaint sought only damages) (see Docket Entry 54 at 11–12), (ii) Plaintiff lacked a

---

3 Around that same time, Plaintiff filed four motions (two captioned as motions for summary judgment, two captioned as motions to continue). (See Docket Entries 41, 43, 45, 47.)

3

viable deliberate-indifference claim against Brathwaite (see id. at
15–20 (noting absence of allegations establishing serious medical
need and Brathwaite's disregard of the same)) and that,
alternatively, qualified immunity would shield her from liability
(see id. at 21–22), and (iii) any such claim against Lance likewise
failed (see id. at 22–24 (explaining that neither denial of
orthopedic shoes nor prescription of certain pain medication
qualified as deliberate indifference)), except for the allegation
that Lance evinced deliberate indifference as to Plaintiff's
alleged spinal fractures (see id. at 24–26 (characterizing alleged
spinal injury as obvious)). Consistent with the foregoing, the
undersigned recommended that the Court dismiss the official-
capacity claims and individual-capacity claim against Brathwaite
but allow the individual-capacity claim against Lance to proceed.
(See id. at 28.)[4] The Court (per United States District Judge
Loretta C. Biggs) adopted that recommendation, such that only "the
Complaint's individual-capacity claim [against Lance] for

---

4       As concerns Plaintiff's requests for relief, the
undersigned determined that Plaintiff improperly had sought summary
judgment before the commencement of discovery (see id. at 26–27)
(and, in any event, had failed to show entitlement to judgment in
his favor (see id. at 27)), and construed Plaintiff's filings
(captioned as motions to continue) as responses to Lance's motions
to dismiss (see id. at 6–7 n.3). For those reasons, the
undersigned recommended that the Court deny Plaintiff's motions for
summary judgment and treat Plaintiff's motions to continue as
responses opposing dismissal (see id. at 28), which recommendation
the Court (per United States District Judge Loretta C. Biggs)
adopted (see Docket Entry 61 at 1–2).

4

deliberate indifference as to Plaintiff's spinal injuries" (Docket Entry 61 at 1) survived dismissal.[5]

Thereafter, the parties commenced discovery. (See Text Order dated Sept. 9, 2020 (adopting Scheduling Order).) After discovery closed, Lance filed the Summary Judgment Motion. (Docket Entry 95; see also Docket Entry 96 (supporting brief).) Plaintiff responded in opposition. (Docket Entry 100); see also Docket Entry 101 (supporting brief).) Lance declined to file a reply. (See Docket Entries dated July 9, 2021, to present.)

## II.  Plaintiff's Allegations

In his unverified Complaint, Plaintiff alleges that:

In March 2017, Plaintiff transferred to ACI, where Lance provided care to Plaintiff on several occasions. (See Docket Entry 2 at 9, 12.) In that regard, Plaintiff saw Lance on October 16, 2018, during which visit Lance discussed an MRI that Plaintiff had received on his spine. (See id. at 9.) At that time, Lance told Plaintiff "that th[ere] was nothing wrong with [his] spine." (See id.) However, "a week or so later[,] a nurse told [Plaintiff] that [he] had two minor fractures to [his] spine. And once [Plaintiff] got the medical records about the MRI, the technician said that [Plaintiff] had three minor fractures to [his] spine, . . . one

---

5 Plaintiff appealed that decision to the United States Court of Appeals for the Fourth Circuit (see Docket Entry 66), which "dismiss[ed] the appeal for lack of jurisdiction," Lewis v. Brathwaite, 834 F. App'x 37, 38 (4th Cir. 2021).

[that] was worse than the other two." (Id.) During two or three subsequent appointments, Lance evaluated Plaintiff but did not mention Plaintiff's spinal fractures. (See id.) That failure to address Plaintiff's back problems has caused Plaintiff to experience continued difficulty and pain while getting in and out of bed, making the bed, and walking. (See id. at 9-10, 12.) In connection with those allegations, Plaintiff submitted, inter alia, several grievance forms and the corresponding responses from prison staff. (See id. at 90-102 (referencing Plaintiff's request for treatment by bone specialist or orthopedic doctor after MRI, complaints of ongoing pain in his bones and joints, supposed diagnoses of osteoarthritis and unspecified bone disease, and notification by unidentified nurse regarding spinal fractures).)

### III. The Record

In support of the Summary Judgment Motion, Lance submitted (i) an affidavit (Docket Entry 97 (the "Lance Affidavit")), (ii) a log of Plaintiff's institutional movements (Docket Entry 97-2), and (iii) certain of Plaintiff's medical records (Docket Entries 97-3, 97-4, 97-5, 97-6, 97-7, 97-8, 97-9, 97-10, 97-11, 97-12, 97-13, 97-14, 97-15, 97-16, 97-17, 97-18, 97-19, 97-20, 97-21, 97-22, 97-23, 97-24, 97-25). For his part, Plaintiff tendered an affidavit (Docket Entry 102 ("Plaintiff's Affidavit")) and several sealed exhibits pertaining to (i) his sick calls between 2017 and 2019 (see Docket Entry 103-1 at 2-67), (ii) notes taken by nurses during

appointments following such calls (see Docket Entry 103-2 at 2-44), (iii) administrative notes (see Docket Entry 103-3 at 2-17), (iv) visits with Defendants and other non-party providers (see Docket Entry 104 at 2-10, 12-31), (v) Plaintiff's receipt of gel insoles in December 2017 (see id. at 11), (vi) his neurology consultation in August 2018 (see Docket Entry 104-1 at 2, 4-5), (vii) evaluations and notes by Lance (see Docket Entry 104-2 at 2-5, 8), (viii) Plaintiff's equipment and restrictions (see Docket Entry 104-3 at 2-6), and (ix) a grievance that Plaintiff filed in April 2019 (see id. at 8-9) (as well as the responses to such grievance (see id. at 7, 10-12)).[6] In addition, Plaintiff has attached an excerpt from his interrogatories to Lance (see Docket Entry 104-2 at 10) and another copy of the informational sheet regarding his thyroid medication (see Docket Entry 103-2 at 45-46), part of which had accompanied the Complaint (see Docket Entry 2 at 8).[7]

---

6 Many, but not all, of the foregoing submissions duplicate (or at least overlap with) documents that Lance attached to the Lance Affidavit. In other instances, filings by either Lance or Plaintiff represent the sole source of certain information. However, because the record reveals no material factual dispute concerning the content of Plaintiff's medical records (i.e., Plaintiff's sick calls, nursing encounters, administrative notes, provider visits, outside consultations, procedures, lab work, or imaging), the chronology in the following subsection qualifies as uncontested, even where it relies on documents or information provided by only one party.

7 The sheet, entitled "Patient Medication Information" (Docket Entry 103-2 at 45 (standard capitalization applied)) for the medication "Levothyroxine" (id.), provides warnings,

7

As relevant to the Summary Judgment Motion, the record reflects the following:

## A. Sick Calls, Encounters, and Provider Visits

Plaintiff requested care on numerous occasions between March 2017 and May 2019, often complaining about pain, as well as an inability to sleep, walk up stairs, access the top bunk, travel to various locations in ACI, and sit or stand for extended periods. (See Docket Entry 103-1 at 2–67; accord Docket Entry 97-1 (indexing sick call appointment requests).)[8] Via those sick calls, Plaintiff also asserted that "Ibuprofen, Tylenol, M[e]loxicam, and [E]lvil" (id. at 4) failed to relieve his pain (see id. at 4, 6–8) and that his prescribed thyroid medication had weakened his bones and/or joints (see id. at 5–6, 27–29). In Plaintiff's view, those circumstances warranted a wheelchair, assistance operating the wheelchair (i.e., a wheelchair "pusher"), a bottom bunk on the bottom floor, a bed board, an extra mattress, an extra thick stuffed pillow, a seat cushion, orthopedic shoes, and different

_____

information that prospective users should tell their doctors, instructions about how to use the medication, "cautions" (id.), possible side effects, instructions about how to report overdoses, and additional information. (See id. at 45–46.) Plaintiff has underlined (i) a cautionary message stating that long-term use of the medication may cause weak bones, and (ii) excerpts indicating that possible side effects include inability to sleep, leg cramps, and muscle weakness. (See id. at 45.)

8   Several sick calls reference issues unrelated to Plaintiff's alleged pain and spinal injuries, to include his requests for a snack bag, dandruff shampoo, and lotion. (See, e.g., Docket Entry 103-1 at 44, 54.)

pain medication, as well as outside consultation with a bone specialist or orthopedic doctor. (See, e.g., id. at 16–21, 32, 37.)

Against that background, Lance took no part in Plaintiff's care between March 2017 and August 2018. (See Docket Entry 97, ¶ 8.)[9] On August 24, 2018, Lance reviewed Plaintiff's chart following a neurological consultation that Plaintiff obtained as a result of his "complaints of weakness and diffuse pain of unknown etiology." (Id., ¶ 10.)[10] The neurologist had recommended a cervical spine MRI and lab work, which orders Lance entered. (See Docket Entry 97-6 at 6–8.) After Plaintiff underwent the MRI on October 3, 2018, the radiologist concluded that Plaintiff had "[c]ervical spondylosis worst at C5-C6 with a posterior disc osteophyte complex resulting in mild canal narrowing and mild left neural foraminal narrowing." (Docket Entry 97-8 at 3.)[11] However,

---

9 Although that information derives from the Lance Affidavit, Plaintiff has not demonstrated that Lance rendered treatment before August 2018, and no document in the record supports that proposition. Other non-party providers treated Plaintiff between March 2017 and August 2018.

10 Another provider referred Plaintiff for a neurological consultation after Plaintiff's annual physical in April 2018, during which he demonstrated unexplained weakness in his extremities. (See Docket Entry 97-5 at 10, 12.) Although that provider initially received notification in August 2018 to review the results of the neurological consultation, that task fell to Lance because the referring provider no longer practiced at ACI at that time. (See Docket Entry 97-6 at 2.)

11 Lance has described "cervical spondylosis" as "age-related wear affecting the spinal disks in the neck" (Docket Entry 97,

9

"[t]he MRI . . . demonstrate[d neither] fractures of the spine nor . . . cervical stenosis." (Docket Entry 97, ¶ 12; accord Docket Entry 97-8 at 2-3.)[12]

Around that same time, Plaintiff requested treatment via a sick call (see Docket Entry 97-9 at 2-4), complaining of back and foot pain (see id. at 5-9 (listing as complaints skin problem, back pain, and sleep trouble and documenting Plaintiff's requests for snack bag, therapy lotion, dandruff shampoo, bed board, and extra mattress)). The (non-party) nurse recorded her responses to Plaintiff's concerns (see id. at 7-9) and requested that Lance review the notes from that appointment (see id. at 9), which he did (see id. at 10).

On October 16, 2018, Plaintiff had a follow-up visit with Lance, during which Lance noted one of the radiologist's impressions of Plaintiff's cervical spine MRI. (See Docket Entry 97-10 at 2 (documenting "mild canal and neural foraminal narrowing due to disk-osteophyte complex worst at C5-6").) In response to Plaintiff's complaint of pain in "every bone in [his] body" (id.), Lance observed Plaintiff's normal vital signs (id. at 2-3) and his

_____

¶ 12).

12 Cervical stenosis is "[a] narrowing of the spinal canal in the cervical (neck) region." Cervical stenosis, J.E. Schmidt, M.D., Attorney's Dictionary of Medicine (Matthew Bender). The radiologist's findings include some mentions of "narrowing" but describe such narrowing as "mild" and nowhere identify "cervical stenosis" by name. (See Docket Entry 97-8 at 2-3.)

10

"ab[ility] to toe-walk without difficulty when asked" despite his stated inability to "plantar flex [his] foot" (id. at 3). Lance noted Plaintiff's normal body weight and lack of weight loss in response to his request for a snack bag (see id. at 2) and "denied [his] requests for [an] extra mattress, shampoo, and lotion [because] no medical criteria support[ed] . . . th[o]se requests [at that time]" (id. at 4; see also id. at 5 (Clinical Indications for Non Clinical Items (all-caps font omitted) (listing qualifying conditions for extra mattress, bottom bunk, bed wedge, extra blankets, and extra pillows)).

In December 2018, Plaintiff submitted another sick call, complaining of pain in his feet, legs, knees, ankles, arms, and hands, stating that such pain interfered with his sleep, and requesting an increase to his pain medication. (See Docket Entry 97-12 at 4.) After a (non-party) nurse examined Plaintiff in connection with those complaints (see Docket Entry 97-12 at 6-7), she assessed him with impaired comfort and advised him that Lance already had addressed "all issues" (id. at 7). The nurse also noted that Plaintiff refused Tylenol and could not "have Ibuprofen, due to other medications taken" (id.). Because the nurse did not refer Plaintiff or his chart to Lance following that appointment, "[Lance] did not render any care to [Plaintiff] relating to the same." (Docket Entry 97, ¶ 16; accord Docket Entry 97-12 at 8 (reflecting no referral to Lance).)

11

Plaintiff received treatment on two other occasions in December 2018: first in connection with a chronic disease diagnosis (hyperlipidemia), for which the (non-party) nurse recommended an exercise regimen (see Docket Entry 97-14 at 2-4), and second following Plaintiff's complaint of "chronic generalized pain" (Docket Entry 97-13 at 3). The notes from the latter visit reflect that Plaintiff requested a bed board, an extra mattress, and orthopedic shoes and that the (non-party) nurse informed Plaintiff he would see the provider regarding those issues. (See id. at 4.)

A follow-up visit with Lance occurred January 15, 2019, at which time Lance considered Plaintiff's requests and evaluated his complaint of "pain all over, especially in [his] feet" (Docket Entry 97-14 at 5). Lance noted "[Plaintiff]'s noncompliance w[ith] oth[er] medical treatment and regimen" and counseled Plaintiff about his recommendation for a colonoscopy. (See id. (reflecting discussion during which Lance warned Plaintiff about possible consequences of ignoring "stool occult blood test"); see also id. at 6-9 (Plaintiff's "Medication Administration Record" from December 2018 and January 2019).) According to Lance, he decided not to prescribe additional pain medication based on Plaintiff's symptoms and his previous refusal of Tylenol. (See Docket Entry 97, ¶ 19.) Additionally, Lance did not order orthopedic shoes because Plaintiff did not "present with objective signs or symptoms suggesting that he would benefit from [the same]" (id.) and

12

declined to order a bed board because Plaintiff had indicated that he would not use one (id.). In response to Plaintiff's subsequent follow-up with a nurse about his ongoing pain and continued request for orthopedic shoes (see Docket Entry 97-15 at 2), Lance entered a note in Plaintiff's record documenting the previous denial of orthopedic shoes (see id. at 4).

In February 2019, Lance participated in Plaintiff's care on two occasions: first in connection with a choking incident that Plaintiff experienced (see Docket Entry 97-16 at 2), after which Lance ordered an endoscopy (see id. at 3-4), and second following Plaintiff's request for a renewal of his rollator walker (see Docket Entry 97-17 at 2, 5-10). With respect to that request, ACI utilizes a form entitled "Medical Duty Status" (id. at 11 (standard capitalization applied)), which reflects Plaintiff's (i) housing restrictions, (ii) activity limitations or restrictions, and (iii) authorized equipment, if any. On February 28, 2019, Lance signed such form renewing Plaintiff's walker (evidently in error)[13] and documenting the expiration dates of Plaintiff's other equipment and restrictions. (See id. (indicating April 2019 expiration of bottom bunk, climbing restriction, and extra blanket, as well as

---

13 Although Lance submitted a form approving the renewal, he averred that he did so in error because "[Plaintiff] did not present with symptoms indicating that the use of a walker was medically necessary, nor did he meet the criteria for a walker." (Docket Entry 97, ¶ 22.)

13

May 2019 expiration of extra pillow and September 2019 expiration of bed board).)[14]

When Plaintiff again sought care at the end of March 2019 (see Docket Entry 97-19 at 2), a non-party nurse noted his requests for extensions of his extra pillow, extra blanket, climbing restriction, and bottom bunk assignment (see id. at 3). During that appointment on April 3, 2019, Plaintiff also reiterated his requests for "orthopedic shoes, . . . a better mattress[,] and a [bed] board." (Id.) The nurse assessed Plaintiff with impaired comfort (id. at 4), ordered Tylenol (id. at 5), and requested that Lance review the notes from the appointment (id.), "which [he] did on April 8, 2019" (Docket Entry 97, ¶ 24). Lance entered no notes in connection with that review. (See id.; accord Docket Entry 97-19 at 6.)

On April 16, 2019, another provider performed an endoscopy on Plaintiff, which revealed "[s]evere esophagitis in [his] mid and lower esophagus" (Docket Entry 97-20 at 2), "[m]oderately severe, diffuse gastropathy [in his stomach] with a few small antral

_____

14    The record contains numerous other Medical Duty Status forms establishing when various nurses or providers documented Plaintiff's housing restrictions, physical limitations or restrictions, and authorized equipment. (See Docket Entry 97-3 at 8; Docket Entry 97-4 at 9, 19, 231-34; Docket Entry 97-7 at 16-19; Docket Entry 97-22 at 5; see also Docket Entry 104-3 at 2-6 (duplicates).) The earliest such form in the record, dated March 2, 2017, reflects no housing restrictions or physical limitations or restrictions when Plaintiff arrived at ACI. (See Docket Entry 97-3 at 8 (noting only eyeglasses as Plaintiff's approved equipment).)

14

erosions" (id.), and "[a] few small benign-appearing polyps" (id.).
Two days later, a non-party nurse encountered Plaintiff in
connection with his complaint of "pain all over his body" (Docket
Entry 97-21 at 2). After measuring Plaintiff's vital signs and
assessing Plaintiff with impaired comfort (see id. at 2-3), the
nurse entered an administrative note to Lance, referencing
Plaintiff's earlier appointment on April 3, 2019, and the upcoming
expiration of his equipment and restrictions (see id. at 5). In
response to that note, Lance reviewed Plaintiff's chart (see id. at
6) and "determined that he did not meet the criteria for renewal of
[the activity restrictions and orders providing a bottom bunk,
extra pillow, and extra blanket]" (Docket Entry 97, ¶ 27; accord
Docket Entry 97-22 at 2).

On April 28, 2019, Lance reviewed the results of Plaintiff's
endoscopy. (See Docket Entry 97-23 at 2-4.) Based on those
results and another provider's recommendation, Lance ordered a
medication to treat Plaintiff's esophagitis and scheduled a follow-
up endoscopy. (See id.) Lance also prescribed a topical pain
relief cream (see id. at 3) and discontinued one of Plaintiff's
pain medications, with instructions to the nursing staff to
"discuss with [Plaintiff the] need to stop . . . [I]ndomethacin in
view of [his] severe esophagitis" (id. at 4).

On May 2, 2019, Plaintiff again presented for treatment,
asking "to see a provider regarding his requests for a bed board,

15

footwear, a bottom bunk assignment, an extra pillow, and extra blanket, and renewal orders of his activity restrictions regarding avoiding climbing." (Id., ¶ 29; accord Docket Entry 97-24 at 3.) After measuring Plaintiff's vital signs and noting "[n]o [s]ignificant [f]indings [and n]o [a]pparent [d]istress" (Docket Entry 97-24 at 3-4), the nurse referred Plaintiff's requests to Lance (id. at 4). Shortly thereafter, Lance reviewed the note without further action or order because "[he] decided that [Plaintiff] still did not meet the criteria necessary to fulfill his requests" (Docket Entry 97, ¶ 29; see also id. (noting that "there had been no change in [Plaintiff's] health since [Lance's] determination at the end of April 2019]")). Lance provided no other care to Plaintiff before he filed the Complaint on May 21, 2019. (Id., ¶ 30; accord Docket Entry 103-2 at 2-44 (reflecting no visits to any provider after May 2, 2019); Docket Entry 104 at 2-10, 12-31 (same).)

**B. Grievance and Responses**

On April 23, 2019, Plaintiff submitted a grievance regarding the expiration of his equipment (extra blanket and extra pillow) and restrictions (bottom bunk and no climbing). (See Docket Entry 104-3 at 8-9.) More specifically, Plaintiff described submitting sick calls regarding the extension of his equipment and restrictions and inquired as to the status of those requests. (See id.) On April 29, 2019, the "Step One - Unit Response" from prison

16

staff indicates that a provider (i.e., Lance) had determined that Plaintiff did not qualify for the requested equipment and restrictions. (See id. at 10.) Plaintiff appealed that response (see id.), and received a "Step Two - Area/Complex/Institution Response" concurring with Step One (see id. at 11). Plaintiff likewise appealed that denial, resulting in a "Step Three - Administrative Remedy Response" stating that the reviewer "found no evidence that staff has treated [Plaintiff] negligently or inappropriately" (id. at 12), found that "[Plaintiff] has been given access to needed medical care" (id.), and found that "the prescribed treatment is solely at the discretion of the attending doctor" (id.).

## C. Interrogatories and Responses

During discovery, Plaintiff served various interrogatories on Lance. (See Docket Entry 104-2 at 10 (identifying document as Lance's response to Plaintiff's second set of interrogatories).) Via Interrogatory 2, Plaintiff asked:

> Since you admit you can read a MRI report . . . [w]hy did you not tell me that I have cervical spondyliosis [sic], worst at C5-C6 with a posterior disc osteophyte complex resulting in mild (not minor) canal narrowing and mild (not minor) left neural forominal [sic] narrowing?

(Id.) Lance responded as follows:

> Objection. [] Lance objects to this interrogatory on the grounds that [] it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence in that it is not limited to a specific time period. Further, [] Lance objects to this interrogatory to the extent that it mischaracterizes his

17

diagnosis of Plaintiff and misstates what [] Lance documented in Plaintiff's chart on October 16, 2018. The documentation set forth in chart speaks for itself.

Subject to and without waiving any objection, [Lance's] October 16, 2018 note regarding the C-spine MRI[] reflects [his] review and a summary of the impression of the MRI C-spine report. During that visit, [Lance] informed Plaintiff that the MRI report was indicative of cervical spondylosis. [Lance] did not recall whether or not [he] used the specific words contained in the MRI C-spine report impression when [he] discussed the diagnosis with Plaintiff.

(<u>Id.</u>) Via Interrogatory 3, Plaintiff asked:

And when you saw me on 10-16-18, and said that their [sic] was nothing wrong with my spine[, w]hy did you . . . write in the comments section of our 10-16-18 meeting[] that[] "MRI C-Spine requested by Dr. Faulcon and done 10-02-18 [sic] at CP-Radiology; mild canal and neural foraminal narrowing due to the disk-osteophyte complex worst at C5-6"?

(<u>Id.</u>) Lance responded, objecting "to the extent that [the foregoing] interrogatory mischaracterizes his diagnosis of Plaintiff and misstates what [he] documented in Plaintiff's chart on October 16, 2018. The documentation set forth in [Plaintiff's] chart on October 16, 2018 speaks for itself." (<u>Id.</u>) Lance further responded that, "[s]ubject to and without waiving any objection, [his] October 16, 2018 note regarding the C-spine MRI[] reflects [his] review and a summary of the impression of the MRI C-spine report." (<u>Id.</u>)

## **D. Lance Affidavit**

According to the Lance Affidavit:

18

"[Lance] treated each and every medical condition with which [Plaintiff] personally presented to [Lance] or which [he] observed during [his] chart reviews when [Plaintiff] or his chart were referred to [Lance]." (Docket Entry 97, ¶ 5.) More specifically, after detailing his involvement in Plaintiff's care (see id., ¶¶ 8-30), Lance averred that he took the following actions regarding Plaintiff:

(i) examined him on October 16, 2018, during which visit Lance reviewed the MRI report, declined to prescribe pain medication other than Tylenol and Indomethacin, and denied Plaintiff's request for an extra mattress (see id., ¶ 33);

(ii) examined him on January 15, 2019, during which visit Lance again prescribed no additional pain medication, counseled Plaintiff about his recommendation for a colonoscopy, and rejected Plaintiff's requests for a bed board and orthopedic shoes (see id.);

(iii) entered a note in Plaintiff's chart regarding Lance's denial of orthopedic shoes (see id.);

(iv) reviewed Plaintiff's chart on February 28, 2019, in connection with his request for a rollator walker (which equipment Lance approved in error) (see id.);

(v) reviewed Plaintiff's chart on April 8, 2019 (see id.), after he continued to complain about "generalized body pain" (id.)

19

and again "requested orthopedic shoes, a bed board, and an extra mattress" (id.);

(vi) reviewed Plaintiff's chart on April 22, 2019, in connection with Plaintiff's requests for "renewal orders for an extra pillow, an extra blanket, and a bottom bunk assignment, as well as renewal of all other activity restrictions" (id.), which requests Lance denied on the grounds that Plaintiff did not meet the applicable criteria (see id.);

(vii) reviewed Plaintiff's chart on April 28, 2019, after Plaintiff underwent an endoscopy, during which review Lance ordered a follow-up endoscopy, approved prescriptions for two medications (see id.), discontinued a prescription that "could exacerbate [Plaintiff's] esophagitis" (id.), and directed "the nursing staff to discuss with [Plaintiff] . . . the need to avoid [Indomethacin and] other nonsteroidal anti-inflammatory medications" (id.); and

(viii) reviewed Plaintiff's chart on May 6, 2019, after a nurse noted Plaintiff's continued requests for equipment and restrictions (see id.).

At bottom, Lance has contended that he rendered appropriate treatment by "conduct[ing] chart reviews and physical examinations, order[ing] and renew[ing] his prescriptions, . . . order[ing] and review[ing] diagnostic tests and other treatment modalities when [his] various medical conditions required it, and referr[ing] him to appropriate specialists when necessary" as well as "receiv[ing]

20

and review[ing] the recommendations of other health care providers, including consulting neurologists to whom [Plaintiff] was referred for care." (Id., ¶ 32.) Moreover, Lance has maintained that he never "ignore[d Plaintiff's] medical needs[,] . . . den[ied] him any necessary treatment for any alleged medical condition" (id., ¶ 33), or acted "for the purpose of causing [him] harm" (id.).

### E. Plaintiff's Affidavit

Plaintiff's Affidavit relates some of Plaintiff's medical history, to include the 35 sick calls he submitted between March 2017 and May 2019, in which he complained about "constant pain in every bone and joint in [his] body" (Docket Entry 102, ¶ 3) and requested "proper medical equipment and restrictions" (id.). However, Plaintiff averred that Lance denied "[m]ost of [his] requests for effective pain medication, equipment, and restrictions" (id.). Plaintiff also swore that he attended numerous appointments (with unspecified nurses and providers) regarding his "unresolved pain issues" (id., ¶ 4). During one such appointment in September 2017, Plaintiff received counseling regarding his non-compliance with medication for his hypothyroidism. (See id. (acknowledging that nurse told Plaintiff taking medication as directed could resolve pain).) In April 2019 and May 2019, Plaintiff inquired "about getting [his] equipment, restrictions, and bottom bunk extended." (Id.) According to Plaintiff, the record reflects numerous "Non Patient Contact

21

Encounters" when providers reviewed (without in-person contact) Plaintiff's repeated complaints of pain and requests for equipment and restrictions. (See id., ¶ 5; see also id. (averring that denial of orthotics occurred without notification to Plaintiff).)

Plaintiff's Affidavit further details the events surrounding his neurology consultation. (See id., ¶ 6.) More specifically, Plaintiff averred that, in January 2018, he received a prescription for a new pain medication (Indomethacin), which provided him some relief. (See id.) After "claim[ing]" spine tenderness during his physical in April 2018 (see id.), Plaintiff received a referral to a neurologist, who recommended an MRI of Plaintiff's neck and noted that Plaintiff may benefit from physical therapy (see id., ¶ 7). As concerns the former, the neurologist discerned a "possible cervical cord issue" that would explain some "neurological findings" but "not explain [Plaintiff's] complaint of pain." (Id.)

Plaintiff's Affidavit provides the following information as to Lance's involvement in Plaintiff's care:

On October 16, 2018, after the MRI, Lance evaluated Plaintiff at ACI. (Id., ¶ 8.) When Plaintiff asked Lance what was wrong with his spine, Lance advised that "[t]here [wa]s nothing wrong with [his] spine." (Id.) However, the comments from that appointment reflect one of the radiologist's findings (i.e., "mild canal and neural forminal [sic] narrowing due to disk-osteophyte complex worst at C5-6"). (Id.) Moreover, in December 2018, a

22

nurse advised Plaintiff "that [the] MRI show[ed] cervical spondylosis." (Id.) In April 2019, Lance determined that Plaintiff did not meet the criteria for his requested equipment and restrictions (extra pillow, extra blanket, and bottom bunk assignment) (see id.), at least some of which another provider had approved in March 2018 (see id., ¶ 9). "[Plaintiff] filed a grievance about getting [his] equipment[] and [his] restrictions (bottom bunk[] and no climbing) . . . reviewed and updated before they r[a]n out." (Id.; see also id. (describing administrative responses).)

Plaintiff's Affidavit concludes with an assertion that Lance ignored Plaintiff's complaints of pain, failed to "tell [him] what was wrong with [his] spine" (id. at 8), and "refused to give [him] proper medical care" (id.).

## DISCUSSION

### I.  Relevant Legal Standards

### A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Additionally, "[a]s to materiality, . . . [o]nly

23

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

"However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, No. 4:08CV2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (unpublished) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir.

1992)), <u>aff'd</u>, 404 F. App'x 740 (4th Cir. 2010); <u>see also</u> <u>Pronin v.</u> <u>Johnson</u>, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). In response to a summary judgment motion, "the nonmoving party [must] go beyond the pleadings and[,] by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Celotex Corp.</u>, 477 U.S. at 324 (internal quotation marks omitted). Factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. <u>See</u> <u>Reeves v. Hubbard</u>, No. 1:08CV721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011) (unpublished), <u>recommendation adopted</u>, slip op. (M.D.N.C. Nov. 21, 2011).

### B. Eighth Amendment

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments.'" <u>Iko v. Shreve</u>, 535 F.3d 225, 238 (4th Cir. 2008) (quoting U.S. Const. amend. VIII). "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993). The Eighth Amendment requires that prison officials "provide humane

25

conditions of confinement," which includes, among other things, "ensur[ing] that inmates receive adequate . . . medical care," Farmer v. Brennan, 511 U.S. 825, 832–33 (1994). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his . . . medical care . . . .[,] it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989)

To make out a constitutional claim for deprivation of medical care, a plaintiff must show that a defendant "acted with 'deliberate indifference' (subjective) to [the plaintiff's] 'serious medical needs' (objective)." Iko, 535 F.3d at 241. A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference when he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must

26

show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer, 511 U.S. at 837)).

"The subjective component . . . sets a particularly high bar to recovery." Iko, 535 F.3d at 241. In particular, "deliberate indifference entails something more than mere negligence, . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). "Failure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." Scinto, 841 F.3d at 232 (brackets in original) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990)), overruled in part on other grounds by Farmer, 511 U.S. at 837. However, neither "[n]egligence [n]or malpractice in the provision of medical services . . . constitute[s] a claim under [Section] 1983." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); see also Harris v. Poole, No. 1:18CV378, 2020 WL 531954, at *14 (M.D.N.C. Feb. 3, 2020) (unpublished) ("[D]isagreements between an inmate and medical provider regarding the inmate's medical care, without more, do not create a constitutional claim, and inmates possess no constitutional right

27

to treatment by a particular type of medical provider."),
recommendation adopted, slip op. (M.D.N.C. Mar. 30, 2020).

Finally, "a significant delay in the treatment of a serious medical condition may, in the proper circumstances," constitute deliberate indifference. Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008). "A[ constitutional] violation only occurs, however, if the delay results in some substantial harm to the patient. Thus, in order to defeat summary judgment on the delay issue, [a plaintiff i]s obligated to establish that the delay in his [treatment] caused him substantial harm . . . ." Id. at 166-67 (footnote omitted); see also Wynn v. Mundo, 367 F. Supp. 2d 832, 838 (M.D.N.C.) ("[D]elay in the receipt of medical care only constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm.") (collecting cases in recommendation filed on December 9, 2004), recommendation adopted, id. at 834, aff'd, 142 F. App'x 193 (4th Cir. 2005).

**C. Section 1983**

"Under [Section] 1983, a state actor may be liable if he 'subjects, or causes to be subjected' an individual 'to the deprivation of any rights, privileges, or immunities secured by the Constitution.' As a general matter, a [state actor] may incur [Section] 1983 liability only through affirmative misconduct." Randall v. Prince George's Cnty., 302 F.3d 188, 202 (4th Cir. 2002) (quoting Parratt v. Taylor, 451 U.S. 527, 535-36 (1981)).

28

"[Section] 1983 must be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). Accordingly, "it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright, 766 F.2d at 850 (quoting Vinnedge, 550 F.2d at 928).

## II. Analysis

Lance has contended that he made appropriate professional decisions regarding Plaintiff's care. (See Docket Entry 96 at 8-14 (paraphrasing and quoting Lance Affidavit).) Moreover, Lance has claimed entitlement to qualified immunity because no constitutional violation occurred (see id. at 14-16) and, in any event, Plaintiff has not demonstrated a violation of "any 'clearly established' constitutional right" (id. at 16 (emphasis omitted)).

In response, Plaintiff has insisted that "a reasonable jury could find that [] Lance was deliberately indifferent to Plaintiff's serious medical condition." (Docket Entry 101 at 1.) According to Plaintiff, Lance remains responsible for the allegedly inadequate medical care that Plaintiff received between his March 2017 arrival at ACI and the filing of the Complaint in May 2019. (See id. at 1-2 (characterizing Lance as "primary physician in charge").) In particular, Plaintiff has contended that the

29

cervical spine MRI revealed "spinal stenous [sic] with a narrowing of his spinal column and osteophyte formations to his spine" (id. at 3), thus confirming Plaintiff's "spinal problems" (id. at 4). Plaintiff has asserted that Lance, despite those problems, (i) never referred Plaintiff to a specialist or orthopedic surgeon (id. at 3–4), (ii) misinformed Plaintiff about the results of his cervical spine MRI (id.), (iii) declined to order testing of Plaintiff's lower spine (id. at 4), (iv) ignored another provider's recommendation of physical therapy (id.), and (v) rejected Plaintiff's requests for equipment and restrictions (including "an extra pillow, extra mattress, bottom bunk, or lower level bottom bunk" (id.)). Plaintiff also has challenged Lance's failure to provide Plaintiff with an alternative to the "usually mild inexpensive medications that did not work to [alleviate] Plaintiff's pain." (Id. at 5; see also id. (suggesting that financial considerations prevented necessary treatment).)

As an initial matter, Plaintiff has attempted to inculpate Lance for all decisions by any "nurse[], nurse practitioner[], or physician assistant[]" (Docket Entry 101 at 2) who participated in Plaintiff's care since his March 2017 arrival at ACI. (See id. at 1–2 (arguing that, by law, all such actors operated "subject to [] Lance").) However, respondeat superior theories of liability do not exist under Section 1983. See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). "Instead, a successful individual[-]capacity claim

30

must allege that the defendant was personally involved in the deprivation of [Plaintiff]'s rights." <u>Bunting v. Cooper</u>, Civ. Action No. 5:17CT3098, 2017 WL 5639948, at *3 (E.D.N.C. May 23, 2017) (unpublished) (citing <u>Vinnedge</u>, 550 F.2d at 928, <u>Iqbal</u>, 556 U.S. at 676, and <u>Monell v. Dep't of Soc. Servs. of City of N.Y.</u>, 436 U.S. 658, 691-92 (1978)), <u>recommendation adopted</u>, 2017 WL 2692617 (E.D.N.C. June 22, 2017) (unpublished), <u>aff'd</u>, 700 F. App'x 315 (4th Cir. 2017). Accordingly, deliberate indifference by Lance, if any, could arise only in connection with treatment that Lance himself rendered (or failed to render) beginning in August 2018. (<u>See</u> Docket Entry 97, ¶ 8 (averring that "neither [Plaintiff] nor his chart were referred to [Lance]" before August 2018).)[15]

Significantly, the only surviving claim concerns Lance's deliberate indifference to Plaintiff's "obvious spinal injury that required professional care" (Docket Entry 54 at 25). (<u>See</u> Docket Entry 61 at 1 (adopting recommendation and allowing "individual-capacity claim for deliberate indifference as to Plaintiff's spinal injuries" to proceed).) Conversely, the undersigned previously concluded that the Court should reject for

---

15 Plaintiff has glossed over the fact that, between March 2017 and August 2018, Lance had no occasion to provide (or refuse) treatment to Plaintiff. (<u>See</u> Docket Entry 101 at 3 ("[Lance] would not order a referral to a specialist for necessary testing to determine the nature and extent of Plaintiff's problems. It was not until [another provider] saw Plaintiff [in April 2018] that he referred him to a neurologist.").)

31

failure to state a deliberate-indifference claim Plaintiff's allegations relating to Lance's (i) denial of orthopedic shoes and (ii) failure to prescribe particular pain medication for Plaintiff. (See Docket Entry 54 at 22–24.) More specifically, the undersigned (i) noted that Plaintiff had failed to establish "a serious medical need for orthopedic shoes" (id. at 23) and (ii) explained that Lance's choice of pain medication lacked eighth-amendment significance (at least, "absent evidence of malicious purpose") (id. at 23–24).

Critically, none of the records accompanying Plaintiff's Affidavit demonstrate that Plaintiff sustained spinal fractures or that Lance disregarded such injury. (See Docket Entries 103-1, 103-2, 103-3, 104, 104-1, 104-2, 104-3.)[16] The Lance Affidavit and attached medical records establish that Lance encountered Plaintiff on a few occasions when he sought medical treatment and, at other times, reviewed Plaintiff's chart. (See Docket Entry 97, ¶¶ 10, 14, 19, 20, 22, 24, 27–29 (summarizing in-person encounters and chart reviews); see also Docket Entries 97-6, 97-10, 97-14, 97-15, 97-17, 97-19, 97-22, 97-23, 97-24 (records documenting such encounters and reviews).) However, none of the foregoing materials offer support for the conclusion that Plaintiff had spinal fractures at all, much less that Lance knew about such fractures and withheld appropriate treatment. In other words, Plaintiff's

_____

16 Of note, such records do not include the radiology report (Docket Entry 97-8).

32

submissions, many of which duplicate Lance's, do not contradict Lance's sworn statement on that issue (Docket Entry 97, ¶ 12 ("The MRI did not demonstrate any fractures of the spine . . . .")).

Instead, the sole factual dispute centers on whether and/or how Lance communicated with Plaintiff about the results of his cervical spine MRI. According to the Lance Affidavit, during a visit with Plaintiff on October 16, 2018, Lance (i) reviewed the radiologist's findings, to include cervical spondylosis, (ii) noted the lack of cervical stenosis, and (iii) concluded that the two pain medications prescribed to Plaintiff remained adequate under the circumstances. (See id., ¶ 14.) Via his (presumably sworn)[17] response to Interrogatory 2, Lance asserted that he advised Plaintiff about the radiologist's impression of cervical spondylosis but could not recall the precise words used in discussing that matter. (See Docket Entry 104-2 at 10.)

In contrast, Plaintiff has averred that Lance told Plaintiff "[t]here [wa]s nothing wrong with his spine." (Docket Entry 102, ¶ 7.) Taking Plaintiff's version as true, Lance's failure to tell Plaintiff about "an age-related degenerative condition . . . usually treated with pain medication" (Docket Entry 97, ¶ 14) could establish deliberate indifference only if it

_____

17 Plaintiff submitted only one page from Lance's responses to Plaintiff's interrogatories (which did not include an attestation by Lance) (see Docket Entry 104-2 at 10), but Federal Rule of Civil Procedure 33 requires that a party answer interrogatories under oath, Fed. R. Civ. P. 33(b)(3).

33

"resulted in any harm to [Plaintiff] or w[as] the result of an effort to deliberately deprive [him] of needed medical care," Ponson v. Correctional Med. Servs., Civ. Action No. 12-1683, 2013 WL 1124507, at *12 (D. Md. Mar. 15, 2013) (unpublished). Especially given that Plaintiff, at the time, possessed prescriptions for two pain medications (which Lance deemed appropriate for treating cervical spondylosis (Docket Entry 97, ¶ 14) and one of which Plaintiff averred provided some relief (Docket Entry 102, ¶ 6)), no reasonable juror could conclude that Lance's failure to communicate the radiologist's finding of cervical spondylosis, on its own, constitutes deliberate indifference.

To the extent Plaintiff has disagreed with Lance about the appropriate course of treatment following the MRI, Plaintiff has not shown that Lance's decisions in that regard evinced deliberate indifference. See Wright, 766 F.2d at 849. Even if Lance's actions amounted to negligence or medical malpractice, such conduct does not give rise to an eighth-amendment claim. See Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("[Deliberate indifference] is a higher standard for culpability than mere negligence or even civil recklessness . . . ."). Although Plaintiff evidently believes, with great conviction and some reason, that he could benefit from an extra pillow, extra mattress, bottom bunk assignment, and physical therapy, Plaintiff possesses

34

a right to treatment based on "medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977). The record reflects no deliberate indifference by Lance in rejecting Plaintiff's repeated requests for more comfortable accommodations and more aggressive treatment. See Thomas v. Commonwealth, No. 7:04CV497, 2005 WL 1074333, at *4 (W.D. Va. May 5, 2005) (unpublished) ("Simply because [a] plaintiff disagrees with the course of treatment prescribed by his doctors does not mean that any of his rights have been violated."). Insofar as Plaintiff has asserted that budgetary concerns influenced Lance's decisions in that regard, Plaintiff has offered no support for that proposition. See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (deeming "[c]onclusory or speculative allegations" insufficient support for non-movant's case).

Moreover, as indicated at the motion-to-dismiss stage (see Docket Entry 54 at 23-24), a prisoner possesses no constitutional entitlement to a particular pain medication. See Roscoe v. Collins, No. 7:17CV494, 2020 WL 1433583, at *10 (W.D. Va. Mar. 23, 2020) (unpublished) ("[D]octor-patient differences over whether 'additional, stronger, or more frequent pain medication was required . . . is insufficient to prevail on a deliberate indifference claim.'" (quoting Drakeford v. Mullins, 678 F. App'x 185, 186 (4th Cir. 2017))). Although "prison officials are not

35

'immunized from constitutional suit' by the fact that they provided a painkiller," Allen v. Ulep, No. 1:19CV1477, 2021 WL 3779246, at *8 (E.D. Va. Aug. 24, 2021) (unpublished) (quoting De'lonta, 708 F.3d at 526), the record lacks evidence tending to show that Lance "persist[ed] in a course of treatment known to be ineffective," id., or that he withheld effective treatment for an impermissible purpose, see Wright, 766 F.2d at 849. In that regard, Lance (i) approved the continued provision of two medications that he deemed suitable for managing Plaintiff's pain (see Docket Entry 97, ¶ 14), (ii) noted Plaintiff's non-compliance with the prescribed course of treatment (see Docket Entry 97-14 at 5-9), (iii) assessed Plaintiff as misrepresenting his ability to complete certain tasks (see Docket Entry 97, ¶ 14), (iv) counseled Plaintiff about a procedure that he believed could reveal the source of Plaintiff's pain (see id., ¶ 19; Docket Entry 97-14 at 5), and (v) discontinued one pain medication only after Plaintiff received a diagnosis that rendered such medication unsuitable (see Docket Entry 97-23 at 4 (noting that discovery of esophagitis necessitated discontinuation of Indomethacin)). The foregoing actions reflect care that satisfies eighth-amendment standards. See Farmer, 511 U.S. at 845.

Finally, in a departure from the Complaint's allegations, Plaintiff has attempted to demonstrate Lance's deliberate indifference while tacitly conceding that Plaintiff suffered no spinal fractures. For example, after suggesting that "[t]he

36

[cervical spine] MRI confirmed that there was a basis for Plaintiff's <u>problems</u>" (Docket Entry 101 at 3 (emphasis added)), Plaintiff has faulted Lance for, inter alia, failing to refer him to an orthopedic surgeon or test <u>other</u> parts of Plaintiff's spine (see <u>id.</u> at 4). Ignoring Plaintiff's abandonment of the crucial allegation that Lance disregarded Plaintiff's spinal fractures, no record evidence indicates that Plaintiff's condition warranted surgery or that Lance unreasonably failed to refer Plaintiff for consideration of the same. (See Docket Entry 97-4 at 96 (neurologist recommending spine consultation if MRI showed "significant stenosis"); Docket Entry 97, ¶ 14 ("The MRI did not demonstrate any cervical stenosis.").) Additionally, Plaintiff has relied on a medical record reflecting the consulting neurologist's impression that a problem with Plaintiff's cervical spine would <u>not</u> explain Plaintiff's complaints of widespread pain throughout his body. (See Docket Entry 104-1 at 4 ("[G]iven [Plaintiff]'s current complaint of diffuse pain[,] I do not believe a cervical cord issue would explain [Plaintiff]'s symptoms[,] but I am concerned that he may have cervical stenosis that may be related to a generalized arthritis."); <u>see also</u> Docket Entry 102, ¶ 7.) In any event, even if the results of the cervical spine MRI qualified as confirmatory, as Plaintiff has suggested (see Docket Entry 101 at 3, 4, 6), he has not shown why such results (from an MRI of Plaintiff's <u>upper</u>

spine) would require, as a medical or constitutional matter, unspecified testing of Plaintiff's <u>lower</u> spine (<u>see</u> <u>id.</u>).

In all, Lance has offered evidence tending to show that he (i) lacked the requisite culpable mental state for a deliberate-indifference claim and (ii) responded reasonably to Plaintiff's symptoms. Under those circumstances, Plaintiff, as "the nonmoving party[, must] go beyond the pleadings and[,] by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Celotex Corp.,</u> 477 U.S. at 324 (internal quotation marks omitted). Plaintiff has failed to present any such competent evidence and may not rely on mere speculation or the allegations of his unverified Complaint to defeat summary judgment. <u>See</u> <u>Pronin</u>, 628 F. App'x at 161. Accordingly, the Court should grant summary judgment in favor of Lance.[18]

**CONCLUSION**

Because the record lacks evidence from which a reasonable fact-finder could conclude that Lance exhibited deliberate

---

[18] This Memorandum Opinion and Recommendation assumes that Plaintiff's complaints of back pain constitutes a serious medical need and declines to consider qualified immunity as an alternative basis for granting judgment for Lance. <u>See</u> <u>Brooks v. Johnson</u>, 924 F.3d 104, 119 n.6 (4th Cir. 2019) ("recogniz[ing] the 'special problem' raised when the objective qualified immunity standard is applied to an Eighth Amendment violation that requires wrongful intent in the form of 'deliberate indifference'" (quoting <u>Rish v. Johnson</u>, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997))).

38

indifference to Plaintiff's serious medical need, Lance has established entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 95) be granted.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 3, 2021

Case 1:19-cv-00528-LCB-LPA   Document 105   Filed 11/03/21   Page 39 of 39